**ORIGINAL** 26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FILED
JAN 26

UNITED STATES OF AMERICA,

Plaintiff,

-vs-

D-1  JAMES R. ROSENDALL, JR.

Defendant.

_____/

Hon. AVERN COHN

No. CR-09-20025

**OFFENSE:** 18 U.S.C. §§ 371 and 666(a)(2) (Bribery Conspiracy)

**MAXIMUM PENALTY:** 5 years in prison, 3 years supervised release

**MAXIMUM FINE:** $250,000

## RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant JAMES R. ROSENDALL, JR. and the government agree as follows:

1.  GUILTY PLEA

    A.  **Count of Conviction**

Defendant will enter a plea of guilty to **Count One** of the Information, which charges conspiracy to commit bribery, in violation of 18 U.S.C. §§ 371 and 666(a)(2).

**B.    Elements of Offense**

The elements of Count One (Conspiracy to Commit Bribery) are:

1.    That two or more persons conspired or agreed to commit bribery as described in paragraph 1.B.4., below;

2.    That the defendant knowingly and voluntarily joined the conspiracy knowing of and intending to help accomplish one or more of its objects;

3.    That a member of the conspiracy took one of the overt acts described in the charging document for the purpose of advancing or helping the conspiracy.

4.    <u>Object of Conspiracy – Bribery – 18 U.S.C. § 666(a)(2)</u>

   (a)    That defendant gave, offered, or agreed to give a thing of value to a person.

   (b)    That the person was an agent of a local government such as the City of Detroit (i.e., the person was authorized to act on behalf of the local government, including as a servant, employee, director, officer, manager or representative).

   (c)    That defendant acted corruptly with the intent to influence or reward the person in connection with a transaction or series of transactions of the local government.

   (d)    That the transaction or series of transactions involved anything of value of $5,000 or more.

   (e)    That the local government received federal assistance in excess of $10,000 in a one-year period.

   (f)    That the Federal assistance was under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of Federal assistance.

(g)    That the one-year period of Federal assistance was within twelve months before or after the commission of the offense.

## C.    Factual Basis for Guilty Plea

The following facts are a sufficient and accurate basis for defendant's guilty plea:

### 1)    Synagro Sludge Contract

From about 1999 to about June 2008, defendant held various positions with Synagro Technologies, Inc., including Vice President of Business Development and President of Synagro of Michigan, Inc. In these roles, defendant assisted Synagro in entering a contingent agreement to acquire a company called Minergy Detroit, LLC. (The contingent agreement was not finalized until July 17, 2007.) Minergy previously had entered a contract with the City of Detroit (hereafter, the "City") on September 30, 1999 to privatize the transportation, treatment and disposal of biosolids generated during the treatment of wastewater at facilities operated by the Detroit Water and Sewerage Department ("DWSD"). Following Synagro's contingent agreement to acquire Minergy, defendant assisted Synagro in persuading the City Administration and City Council to amend and restate the Minergy contract so Synagro could perform the contract using its own treatment and disposal processes (hereafter, "Synagro contract").

In March 2003, Synagro submitted a proposal to DWSD to revise the Minergy contract. Thereafter, Synagro officials worked with City and DWSD officials to resolve various financial, liability, environmental and regulatory issues. In June 2007, DWSD approved the amended and restated Synagro contract. The contract was presented to the City Council, which approved it by a 5-to-4 vote on November 20, 2007. The Mayor's Office signed a resolution approving the contract on November 27, 2007. The estimated value of the contract was $47 million per year or about $1.175 billion over the 25-year term of the contract.

The parties stipulate that the United States Environmental Protection Agency ("U.S. EPA"), a federal agency, provided over $10,000 in federal assistance to DWSD during the events described in this factual statement. Specifically, during the period from September 2002 to April 2007, the U.S. EPA provided DWSD a total of $1,539,900 in direct earmark grants (also known as "Special Appropriations Act" projects) for maintaining and improving DWSD equipment and facilities, as follows: $470,500 on September 25, 2002; $346,900 on September 23, 2004; $385,700 on July 14, 2005; and $336,800 on April 24, 2007. During 2007, U.S. EPA also contributed to the State Revolving Fund Program administered by the Michigan Department of Environmental Quality, which resulted in a loan of $167,565,000 to DWSD for infrastructure improvements.

### a)    Items of Value Given to City Officials

In 2001, defendant met with "*City Official A*" and an aide in Lansing, Michigan. During the meeting, defendant gave *City Official A* and the aide several bundled campaign checks. Defendant told *City Official A* that defendant worked for Synagro, which was interested in taking over the Minergy contract. *City Official A* responded that they would see where it went.

In about late 2002, defendant met with *City Official A* in a hotel suite in Grand Rapids, Michigan. Defendant described in more detail Synagro's plan to purchase Minergy's contract with the City. *City Official A* instructed defendant to work with his aide, "*City Official B*," regarding the matter.

After defendant's initial meetings with *City Official A*, defendant attended fund raisers for *City Official A* and donated about two hundred thousand dollars to various non-profits, political action committees and campaign entities associated with *City Official A*, as directed by *City Official B*, "*Aide to City Official A*" (a member of the City of Detroit Administration and later a campaign aide to *City Official A*) and others.

On about September 12, 2003, defendant chartered a private jet, costing about $18,000 to $20,000, to take *City Official A*, *City Official B*, and others from the Eastern District of Michigan to Las Vegas, Nevada,

returning on about September 14, 2003, in part, to attend a boxing title fight. On about April 1, 2004, defendant chartered another private jet, costing about $15,000 to $18,000, to take *City Official B*, *Aide to City Official A,* and others from the Eastern District of Michigan to Las Vegas, returning about April 4, 2004, for an ultimate fighting championship. On about June 3, 2004, defendant chartered a private plane to fly *Aide to City Official A* to and from Mackinac Island for a conference. In about June 2007, defendant chartered another private plane to return *City Official A*, "*Relative A of Official A*" (hereafter, "*Relative A*") and another family member of *City Official A* to Detroit from the conference. On at least one occasion, defendant chartered a private plane and took *City Official B* to and from Mackinac Island for a conference. None of these expenses were reimbursed in whole or in part by *City Officials A, B or C*, or other City officials.

**b)    Association with *Relative A***

In about early 2004, defendant met with *City Official A* in Detroit at a fund raiser for *City Official A*. At that time, *City Official A* told defendant he wanted him to work with *Relative A* of *City Official A*. *Relative A* held no official position or employment with the City and defendant was not familiar with what *Relative A*'s profession was or how he could assist defendant in obtaining the Synagro contract with the City. Nevertheless, defendant understood that *City Official A* was directing him to work with *Relative A* so Synagro could obtain business from the City and be successful in obtaining approval of the Synagro contract.

Not long after this meeting, *Relative A* introduced defendant to "*Intermediary A*" as defendant's point-of-contact in obtaining the Synagro contract. After being handed off to *Intermediary A,* defendant's contacts with *Relative A* became limited and *Relative A* spent little time helping obtain City Council approval of the Synagro contract. Nevertheless, *Relative A* periodically requested money from defendant, including "loans" that were never repaid. Between early 2004 and 2008, defendant made these payments to *Relative A*, totaling at least $25,000.

In about 2006, *Relative A* introduced defendant to "*Intermediary B*", who was an associate and former girlfriend of *Relative A*. *Relative A* said that *Intermediary B* would be in charge of recruiting and hiring minority contractors to help build and operate the Synagro facility. At that time, *Relative A* informed defendant that *Relative A* had an agreement with *Intermediary A* whereby *Relative A* would receive fifty percent of all the proceeds *Intermediary A* received from Synagro, or about $1 million over three years. *Relative A* wanted *Intermediary B* to be named in any Synagro contracts involving *Relative A*, rather than *Relative A*, himself, to conceal *Relative A's* interests in the contracts. There was never a written agreement between Synagro and *Relative A*.

On December 4, 2007, shortly after the Synagro contract was finalized, defendant met with *Relative A* and *Intermediary B*. *Relative A* explained that he had an unwritten agreement with *Intermediary A* that any profits from the Synagro contract would be apportioned as follows: 45% to *Relative A*, 45% to *Intermediary A* and 10% to *Intermediary B*, with *Relative A's* share in the payments concealed. On December 20, 2007, after defendant had not paid *Relative A* money to which *Relative A* believed he was entitled, *Relative A* met with defendant in a parking lot in Detroit and threatened that "we" would "kill" the Synagro contract if *Relative A* was not compensated to his satisfaction. At that time, defendant gave *Relative A* several hundred dollars in cash, hidden in a pack of chewing gum. At the same time, defendant gave *Relative A* a case of Cristal champagne for *City Official A*.

On about January 29, 2008, at the direction of the Federal Bureau of Investigation (FBI), defendant covertly tape-recorded a meeting with *Relative A* and *Intermediary B* at a Detroit restaurant. At that time, *Relative A* confirmed that he had threatened to "kill" the Synagro contract, including delaying the City's issuance of Synagro's permits, if defendant did not compensate *Relative A* to *Relative A's* satisfaction. When defendant noted that *Relative A* had done no work with *Intermediary A* to get the Synagro contract approved, *Relative A* said, "I got you to the table." Defendant offered *Relative A* $2,500 in cash (supplied by the FBI), which *Relative A* refused.

On about March 5, 2008, defendant, acting under the supervision of the FBI, met twice alone with *Relative A* outside of *Relative A's* apartment in Detroit. During the first meeting, *Relative A* explained that he refused the $2,500 cash payment (during the January 29, 2008 meeting) because it was handed to him in a public restaurant with *Intermediary B* and potential cameras present. *Relative A* whispered, "I don't ever want anybody to see me take some money from somebody." *Relative A* later held up five fingers, showing his expectation that defendant give him $5,000. During the second meeting later that day, defendant handed *Relative A* $2,500 in cash (provided by the FBI).

### c) Items of Value Given to *Council Member A*

After *Relative A* introduced defendant to *Intermediary A* in 2004, defendant worked primarily with *Intermediary A* in an effort to obtain City Council approval of the Synagro contract. From about 2004 to 2008, defendant and Synagro paid *Intermediary A* over $150,000 in expenses to facilitate the Synagro contract. This included making periodic campaign contributions to City Council Members, as well as donations to Council Members' favored projects and organizations, and payments to various churches, civic leaders, community groups and organizers in exchange for their support (or non-opposition) to the Synagro facility. In 2007, *Intermediary A* advised defendant that *"Aide to Council Member A"* requested money from *Intermediary A* in exchange for *"City Council Member A's"* vote in favor of the Synagro contract. In the fall of 2007, *Intermediary A* told defendant that he had made, or had promised to make, payments to *Council Member A* to help obtain *Council Member A's* vote in favor of the Synagro contract.

In October 2007, *Council Member A* questioned the need to privatize the processing and disposal of DWSD's sludge because of potential loss of City jobs and environmental issues. On November 20, 2007, despite *Council Member A's* earlier misgivings, *Council Member A* voted in favor of the Synagro contract. That same afternoon, defendant told *Intermediary A* that defendant would direct Synagro to wire *Intermediary A* $25,000 for use as campaign contributions and other forms of support to ensure that *Council Member A* and other supporters of the Synagro contract did not change

their positions during the grace period in which City Council Members could withdraw their votes in favor of the contract.

### 2) Systematic Recycling Composting Facility

On December 28, 2006, defendant's company, Alliance Leasing & Rental, LLC, purchased an 18-acre parcel of land located at 9125 West Jefferson, in the Delray area of southwest Detroit, for $1.3 million. Thereafter, defendant agreed to lease the property to Systematic Recycling, LLC for the purpose of operating a composting facility on the property. Systematic Recycling operated the facility under a temporary permit granted by the City's Buildings and Safety Engineering Department until the City shut down operations at the facility after receiving community complaints about it. In order to restart operations, defendant was advised that Systematic Recycling needed to enter a "Community Host Agreement" with the City.

Defendant discussed giving *Aide to City Official A* a financial interest in defendant's business in exchange for *Aide to City Official A's* assistance in obtaining the Community Host Agreement. Defendant also gave *Aide to City Official A* $2,000 in cash to give to *City Official B* as an inducement to facilitate the City administration's support of the Community Host Agreement. Defendant drove *Aide to City Official A* to *City Official B's* home, at which time *Aide to City Official A* dropped off the money for *City Official B*. In September and October 2007, *Relative A* also inquired about receiving regular payments from Systematic Recycling, although *Relative A* did not facilitate the Community Host Agreement.

During the period October to December 2006, defendant caused Systematic Recycling to pay *Intermediary A* over $20,000, in part, to help defendant obtain later approval of the Community Host Agreement with the Detroit City Council, which was receiving opposition to the facility from local community groups and activists. *Intermediary A* set up a meeting with *Aide to Council Member A* at a restaurant in downtown Detroit to discuss the Community Host Agreement. During the meeting, *Aide to Council Member A* suggested that if defendant hired the *Aide* as a consultant, he could obtain the Agreement, but if he did not hire the *Aide,* then the defendant would not obtain the

- 8 -

Agreement. *Intermediary A* later advised defendant that the *Aide* would need to be paid $5,000 per month. Defendant declined to pay the *Aide.* During one of the City Council sessions regarding the matter, defendant learned that *Intermediary A* had not made a payment or donation for the benefit of *Council Member A*. *Council Member A* said words to the effect of "you don't have my vote and you're short." At the conclusion of the session, *Council Member A* walked out of council chambers, passed defendant and *Intermediary A*, then turned to them and said, "f**k you."

On March 28, 2007, *Council Member A* voted in favor of the Community Host Agreement, allowing Systematic Recycling to restart composting operations. Sometime thereafter, *Intermediary A* informed defendant that he met with *Council Member A* on Mackinac Island and straightened out their disagreement over the amount of money *Council Member A* was to receive for supporting the Host Community Agreement. *Intermediary A* advised defendant that he paid *Council Member A* around $5,000 to $8,000 in cash.

3)      **Purpose of Items of Value**

Defendant, or persons on his behalf, provided the items of value described above with the intent to influence and reward agents of the City in connection with their support and approval of the Synagro contract and the Systematic Recycling Community Host Agreement.

2.      **SENTENCING GUIDELINES**

A.      **Standard of Proof**

The Court will find sentencing factors by a preponderance of the evidence.

## B.    Sentencing Guidelines

There are no sentencing guideline disputes.  As set forth in the attached worksheets, defendant's range of imprisonment under the sentencing guidelines exceeds the sixty (60) month statutory maximum term of prison.  Accordingly, defendant's guidelines term of prison is sixty (60) months.

## 3.    SENTENCE

The Court will impose a sentence pursuant to 18 U.S.C. §3553, and in doing so must consider the sentencing guideline range.

### A.    Imprisonment

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the sentence of imprisonment in this case may not exceed the sentence set forth in Paragraph 4.A.2.B, below.

### B.    Supervised Release

A term of supervised release, if imposed, follows the term of imprisonment. There is no agreement on supervised release.  In other words, the Court may impose any term of supervised release up to the statutory maximum term, which in this case is **3 years**. The agreement concerning imprisonment described above in Paragraph 3A does not apply to any term of imprisonment that results from any later revocation of supervised release.

**C.    Special Assessment**

Defendant will pay a special assessment of **$100** and must provide the government with a receipt for the payment before sentence is imposed.

**D.    Fine**

The parties agree that the fine will be no more than the maximum amount of $200,000.

**E.    Restitution**

Restitution is not applicable to this case.

**4.    A.    COOPERATION AGREEMENT**

The parties agree as follows:

1.    Cooperation.    Defendant agrees to assist the United States Attorney's Office in the investigation and prosecution of others involved in criminal activities, as specified below.

a.    Truthful Information and Testimony.    Defendant will provide truthful and complete information concerning all facts of this case known to him. Defendant will provide full debriefings as requested to the U.S. Attorney, and federal, state, and local law enforcement agencies. Defendant will provide truthful testimony at all proceedings, criminal, civil, or administrative, as requested by the U.S. Attorney.  Such testimony may

- 11 -

include, but is not limited to, grand jury proceedings, trials, and pretrial and post-trial proceedings. Defendant agrees to be available for interviews in preparation of all testimony. Defendant further agrees to submit, upon request, to government-administered polygraph examinations to verify defendant's full and truthful cooperation. Defendant understands that this obligation to provide cooperation continues after sentencing and that failure to follow through constitutes a breach of this agreement.

b.      <u>Nature of Cooperation.</u> The defendant agrees to cooperate in good faith, meaning that the defendant will not only respond truthfully and completely to all questions asked, but will also volunteer all information that is reasonably related to the subjects discussed in the debriefing. In other words, the defendant may not omit facts about crimes, participants, or defendant's involvement, and then claim not to have breached this agreement because defendant was not specifically asked questions about those crimes, participants, or involvement. Defendant will notify the U.S. Attorney in advance if defendant intends to offer a statement or debriefing to other persons other than defendant's attorney. Defendant is not prevented in any way from providing truthful information helpful to the defense of any person. Any actions or statements inconsistent with continued cooperation under this agreement, including but not limited to

- 12 -

criminal activity, or a statement indicating a refusal to testify, or any other conduct which in any way undermines the effectiveness of defendant's cooperation, constitutes a breach of this agreement.

2.    Government's Authority Regarding Substantial Assistance

a.    Substantial Assistance Determination.    It is exclusively within the government's discretion to determine whether defendant has provided substantial assistance. Upon the government's determination that defendant's cooperation amounts to substantial assistance in the investigation or prosecution of others, the government will either seek a downward departure at sentencing under U.S.S.G. § 5K1.1, or a reduction of sentence pursuant to Fed. R. Crim. P. 35, as appropriate.   The government may recommend that a specific downward departure and resulting sentence is appropriate; however, if the government makes such a motion, the amount of the reduction, if any, will be determined by the Court.

b.    Downward Departure.   The parties agree that based on defendant's substantial assistance to date, the government will make a motion at or before the time of sentencing recommending that the defendant be sentenced to no higher than **eleven (11) months**, which falls within "Zone B" of the Sentencing Table.  The defendant may argue for a

different sentence than the government.  The Court may accept the government's recommendation or the defendant's recommendation and sentence defendant to a term within that respective range.

      c.    <u>Use of Information Against Defendant.</u>  In exchange for defendant's agreement  to cooperate with the government, as outlined above, the government agrees not to use new information that defendant provides (pursuant to this agreement) about defendant's own criminal conduct against defendant at sentencing in this case.  Such information may be revealed to the court but may not be used against the defendant in determining defendant's sentence range, choosing a sentence within the range, or departing from the range.  There shall be no such restrictions on the use of information: (1) previously known to law enforcement agencies; (2) revealed to law enforcement agencies by, or discoverable through, an independent source; (3) in a prosecution for perjury or giving a false statement; or (4) in the event there is a breach of this agreement.

## 5.   <u>OTHER CHARGES</u>

If the Court accepts this agreement, the government will not bring additional charges against defendant based on any of the conduct reflected in this plea agreement or the attached worksheets.

**6.    EACH PARTY'S RIGHT TO WITHDRAW FROM THIS AGREEMENT**

The government may withdraw from this agreement if the Court finds the correct guideline range to be different than is determined by Paragraph 2B.

Defendant may withdraw from this agreement, and may withdraw his guilty plea, if the Court decides to impose a sentence higher than the maximum allowed by Part 4. This is the only reason for which defendant may withdraw from this agreement. The Court shall advise defendant that if he does not withdraw his guilty plea under this circumstance, the Court may impose a sentence greater than the maximum allowed by Part 4.

**7.    RIGHT TO APPEAL**

If the sentence imposed falls within the guideline range allowed by Paragraph 2B, above, defendant waives any right to appeal his conviction or sentence. If the sentence imposed is above that range, defendant retains his right to directly appeal the Court's guideline determination. The government agrees not to appeal any sentence within the agreed upon guideline range in Paragraph 2B, but retains the right to appeal any determination by the Court to apply a lower range.

**8.    CONSEQUENCES OF WITHDRAWAL OF GUILTY PLEA OR VACATION OF**

**CONVICTION**

If defendant is allowed to withdraw his guilty plea or if any conviction

entered pursuant to this agreement is vacated, the Court shall, on the

government's request, reinstate any charges that were dismissed as part of this

agreement.  If additional charges are filed against defendant within six months

after the date the order vacating defendant's conviction or allowing him to

withdraw his guilty plea becomes final, which charges relate directly or indirectly

to the conduct underlying the guilty plea or to any conduct reflected in the

attached worksheets, defendant waives his right to challenge the additional

charges on the ground that they were not filed in a timely manner, including any

claim that they were filed after the limitations period expired.

**9.    PARTIES TO PLEA AGREEMENT**

Unless otherwise indicated, this agreement does not bind any government

agency except the United States Attorney's Office for the Eastern District of

Michigan.

**10.    SCOPE OF PLEA AGREEMENT**

This agreement, which includes all documents that it explicitly incorporates,

is the complete agreement between the parties.  It supersedes all other promises,

representations, understandings, and agreements between the parties

concerning the subject matter of this plea agreement that are made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

This agreement does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

**11.    ACCEPTANCE OF AGREEMENT BY DEFENDANT**

This plea offer expires unless it has been received, fully signed, in the

Office of the United States Attorney by 5:00 P.M. on January 28, 2009.  The

government reserves the right to modify or revoke this offer at any time before

defendant pleads guilty.

Terrence Berg
Acting United States Attorney


_____
LYNN HELLAND
ASSISTANT UNITED STATES ATTORNEY
CHIEF, SPECIAL PROSECUTIONS UNIT

_____
MARK CHUTKOW
ASSISTANT UNITED STATES ATTORNEY

_____
R. MICHAEL BULLOTTA
ASSISTANT UNITED STATES ATTORNEY

DATE: JANUARY 26, 2009

BY SIGNING BELOW, DEFENDANT ACKNOWLEDGES THAT HE HAS READ (OR BEEN
READ) THIS ENTIRE DOCUMENT, UNDERSTANDS IT, AND AGREES TO ITS TERMS.  HE ALSO
ACKNOWLEDGES THAT HE IS SATISFIED WITH HIS ATTORNEY'S ADVICE AND
REPRESENTATION.  DEFENDANT AGREES THAT HE HAS HAD A FULL AND COMPLETE
OPPORTUNITY TO CONFER WITH HIS LAWYER, AND HAS HAD ALL OF HIS QUESTIONS
ANSWERED BY HIS LAWYER.

_____
PAUL DENENFELD
ATTORNEY FOR DEFENDANT

_____
JAMES R. ROSENDALL, JR.
DEFENDANT

DATE: JANUARY 26, 2009

- 18 -

# WORKSHEET A   (Offense Levels)

Defendant:     James R. Rosendall, Jr.                    Count(s):            1 of Information

Docket No.:    CR-09-20025                                Statute(s):    18 U.S.C. 371, 666

Complete one Worksheet A for each count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction) before applying the multiple-count rules in U.S.S.G. ch. 3, pt. D. However, in any case involving multiple counts of conviction, if the counts of conviction are all "closely related" to each other within the meaning of U.S.S.G. § 3D1.2(d), complete only a single Worksheet A.

## 1.    BASE OFFENSE LEVEL AND SPECIFIC OFFENSE CHARACTERISTICS  (U.S.S.G. ch. 2)

| Guideline Section | Description | Levels |
|---|---|---|
| 2C1.1 | Base Offense Level | 12 |
| 2C1.1(b)(1) | Involved more than one bribe | +2 |
| 2C1.1(b)(2)/2B1.1 | Value of benefit to be received more than $20 million | +22 |
| 2C1.1(b)(3) | Offense involved elected official | +4 |
| | | |

## 2.    ADJUSTMENTS  (U.S.S.G. ch. 3, pts. A, B, C)

| Guideline Section | Description | Levels |
|---|---|---|
| | | |
| | | |
| | | |

## 3.    ADJUSTED OFFENSE LEVEL

Enter the sum of the offense levels entered in Items 1 and 2. If this Worksheet A does not cover every count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction), complete one or more additional Worksheets A and a single Worksheet B.

**40**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*If this is the only Worksheet A, check this box and skip Worksheet B.*    **X**

*If the defendant has no criminal history, check this box and skip Worksheet C.*    **X**

(rev. 06/99)

# WORKSHEET B   (Multiple Counts)

**Instructions**  **(U.S.S.G. ch. 3, pt. D):**

- Group the counts of conviction into distinct Groups of Closely Related Counts. "All counts involving substantially the same harm shall be grouped together into a single Group." (*See* U.S.S.G. § 3D1.2.)

- Determine the offense level applicable to each Group. (*See* U.S.S.G. § 3D1.3.)

- Determine the combined offense level by assigning "units" to each Group as follows (*see* U.S.S.G. § 3D1.4):

    - assign 1 unit to the Group with the highest offense level,
    - assign 1 unit to each additional Group that is equally serious as, or 1 to 4 levels less serious than, the Group with the highest offense level,
    - assign ½ unit to each Group that is 5 to 8 levels less serious than the Group with the highest offense level, .
    - assign no units to each Group that is 9 or more levels less serious than the Group with the highest offense level.

1. **GROUP ONE: COUNTS** _____
   **ADJUSTED OFFENSE LEVEL**                                   | unit |

2. **GROUP TWO: COUNTS** _____
   **ADJUSTED OFFENSE LEVEL**                                   | unit |

3. **GROUP THREE: COUNTS** _____
   **ADJUSTED OFFENSE LEVEL**                                   | unit |

4. **GROUP FOUR: COUNTS** _____
   **ADJUSTED OFFENSE LEVEL**                                   | unit |

5. **TOTAL UNITS**                                             | units |

6. **INCREASE IN OFFENSE LEVEL**

   | 1 unit  ➜  no increase | 2½-3 units  ➜  add 3 levels |
   | 1½ units  ➜  add 1 level | 3½ -5 units  ➜  add 4 levels |
   | 2 units  ➜  add 2 levels | >5 levels  ➜  add 5 levels |

7. **ADJUSTED OFFENSE LEVEL OF GROUP**
   **WITH THE HIGHEST OFFENSE LEVEL**

8. **COMBINED ADJUSTED OFFENSE LEVEL**

   Enter the sum of the offense levels entered in Items 6 and 7.



(rev. 06/99)

# WORKSHEET C  (Criminal History)

Date of defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses):    January 2003

## 1.    PRIOR SENTENCES

### Prior Sentence of Imprisonment Exceeding 13 Months (U.S.S.G. §§ 4A1.1(a)):    3 POINTS

Enter 3 points for each prior adult sentence of imprisonment exceeding one year and one month that either (1) was imposed within 15 years of the defendant's commencement of the instant offenses (taking into account relevant conduct and stipulated offenses) or (2) resulted in the defendant's confinement during any part of that 15-year period.  (See U.S.S.G. §§ 4A1.1(a), 4A1.2(d)(1), (e)(1).)

### Prior Sentence of Imprisonment of at Least 60 Days (U.S.S.G. §§ 4A1.1(b)):    2 POINTS

Enter 2 points for each prior sentence of imprisonment of at least 60 days not counted under U.S.S.G. § 4A1.1(a) that either (1) resulted from an offense committed after the defendant turned 18 and was imposed within 10 years of the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) (see U.S.S.G. §§ 4A1.1(b), 4A1.2(e)(2)) or (2) resulted from an offense committed before the defendant turned 18 and resulted in the defendant's confinement during any part of the 5-year period preceding the defendant's commencement of the instant offense (see U.S.S.G. §§ 4A1.1(b), 4A1.2(d)(2)(A)).

### Other Prior Sentences (U.S.S.G. §§ 4A1.1(c)):    1 POINT

Enter 1 point for each prior sentence not counted under U.S.S.G. § 4A1.1(a) or (b) that either (1) resulted from an offense committed after the defendant turned 18 and was imposed within 10 years of the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) (see U.S.S.G. §§ 4A1.1(c), 4A1.2(e)(2)) or (2) resulted from an offense committed before the defendant turned 18 and was imposed within 5 years of the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) (see U.S.S.G. §§ 4A1.1(c), 4A1.2(d)(2)(B)).  NOTE:  No more than 4 points may be added under this item.

| Date of Imposition | Status* | Offense | Sentence | Release Date** | Points |
|---|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ | |
| _____ | _____ | _____ | _____ | _____ | |
| _____ | _____ | _____ | _____ | _____ | |
| _____ | _____ | _____ | _____ | _____ | |
| _____ | _____ | _____ | _____ | _____ | |
| _____ | _____ | _____ | _____ | _____ | |

*    If the defendant committed the offense before turning 18, indicate whether he or she was sentenced as a juvenile (J) or as an adult (A).

**   A release date is required in only three situations:  (1) when a sentence covered under U.S.S.G. § 4A1.1(a) was imposed more than 15 years before the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) but resulted in his or her confinement during any part of that 15-year period; (2) when a sentence counted under U.S.S.G. § 4A1.1(b) was imposed for an offense committed before the defendant turned 18 but resulted in his or her confinement during any part of the 5-year period preceding his or her commence-ment of the instant offense (taking into account relevant conduct and stipulated offenses); and (3) when 2 criminal history points are added pur-suant to U.S.S.G. § 4A1.1(e) because the defendant committed the instant offense (taking into account relevant conduct and stipulated offenses) shortly after or during imprisonment resulting from a sentence counted under U.S.S.G. § 4A1.1(a) or (b) or while he or she was on escape status for such a sentence.

(rev. 06/99)

**2.    COMMISSION OF INSTANT OFFENSE WHILE UNDER PRIOR SENTENCE (U.S.S.G. § 4A1.1(d))**

Enter 2 points if the defendant committed any part of the instant offense (taking into account relevant conduct and stipulated offenses) while under any criminal justice sentence having a custodial or supervisory component, including probation, parole, supervised release, imprisonment, work release, and escape status. (*See* U.S.S.G. §§ 4A1.1(d), 4A1.2(m), (n).) List the type of control and identify the sentence from which it resulted.

_____

**3.    COMMISSION OF INSTANT OFFENSE SHORTLY AFTER OR DURING IMPRISONMENT (U.S.S.G. § 4A1.1(e))**

Enter 2 points if the defendant committed any part of the instant offense (taking into account relevant conduct and stipulated offenses) either less than 2 years after release from imprisonment on a sentence counted under U.S.S.G. §§ 4A1.1(a) or 4A1.1(b) or while in imprisonment or escape status on such a sentence. However enter, only 1 point for this item if 2 points were added under Item 2. (*See* U.S.S.G. §§ 4A1.1(e), 4A1.2(n).) List the date of release and identify the sentence from which it resulted.

_____

**4.    PRIOR SENTENCE RESULTING FROM CRIME OF VIOLENCE (U.S.S.G. § 4A1.1(f))**

Enter 1 point for each prior sentence resulting from a conviction for a crime of violence that did not receive any points under U.S.S.G. § 4A1.1(a), (b), or (c) because such sentence was considered related to another sentence resulting from a conviction for a crime of violence. But enter no points where the sentences are considered related because the offenses occurred on the same occasion. (*See* U.S.S.G. §§ 4A1.1(f), 4A1.2(p).) Identify the crimes of violence and briefly explain why the cases are considered related. NOTE: No more than 3 points may be added under this item.

_____

_____

**5.    TOTAL CRIMINAL HISTORY POINTS**

Enter the sum of the criminal history points entered in Items 1-4.

**6.    CRIMINAL HISTORY CATEGORY**

| Total Criminal History Points | Criminal History Category |
|:---:|:---:|
| 0 – 1 | I |
| 2 – 3 | II |
| 4 – 6 | III |
| 7 – 9 | IV |
| 10 – 12 | V |
| ≥ 13 | VI |



(rev. 06/99)

# WORKSHEET D   (Guideline Range)

**1.**    **(COMBINED) ADJUSTED OFFENSE LEVEL**



Enter the adjusted offense level entered in Item 3 of Worksheet A or the combined adjusted offense level entered in Item 8 of Worksheet B.

**2.**    **ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY  (U.S.S.G § 3E1.1)**



**3.**    **TOTAL OFFENSE LEVEL**

Enter the difference between Items 1 and 2.

**4.**    **CRIMINAL HISTORY CATEGORY**

Enter "I" if the defendant has no criminal history.  Otherwise, enter the criminal history category entered in Item 6 of Worksheet C.

**5.**    **CAREER OFFENDER / CRIMINAL LIVELIHOOD / ARMED CAREER CRIMINAL (U.S.S.G. ch. 4, pt. B)**

    a.    <u>Total Offense Level</u>:  If the career offender provision (U.S.S.G. § 4B1.1), the criminal livelihood provision (U.S.S.G. § 4B1.3), or the armed career criminal provision (U.S.S.G. § 4B1.4) results in a total offense level higher than the total offense level entered in Item 3, enter the higher offense level total.



    b.    <u>Criminal History Category</u>:  If the career offender provision (U.S.S.G. § 4B1.1) or the armed career criminal provision (U.S.S.G. § 4B1.4) results in a criminal history category higher than the criminal history category entered in Item 4, enter the higher criminal history category.

**6.**    **GUIDELINE RANGE FROM SENTENCING TABLE  (U.S.S.G. ch. 5, pt. A)**



Enter the guideline range in the Sentencing Table (*see* U.S.S.G. ch. 5, pt. A) produced by the total offense level entered in Item 3 or 5.a and the criminal history category entered in Item 4 or 5.b.

**7.**    **STATUTORY RESTRICTIONS ON OR SUPERSESSION OF GUIDELINE RANGE**



If the maximum sentence authorized by statute is below, or a minimum sentence required by statute is above, the guideline range entered in Item 6, enter either the guideline range as restricted by statute or the sentence required by statute. (*See* U.S.S.G. § 5G1.1.) If the sentence on any count of conviction is required by statute to be consecutive to the sentence on any other count of conviction, explain why.

# WORKSHEET E   (Authorized Guideline Sentences)

**1.    PROBATION  (U.S.S.G. ch. 5, pt. B)**

      a.    <u>Imposition of a Term of Probation</u>  (U.S.S.G. § 5B1.1)

**[X]**    1.   Probation is not authorized by the guidelines (minimum of guideline range > 6 months or statute of conviction is a Class A or a Class B felony).  If this box is checked, go to Item 2 (Split Sentence).

**[ ]**    2.   Probation is authorized by the guidelines (minimum of guideline range = zero months).

**[ ]**    3.   Probation is authorized by the guidelines, provided the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention satisfying the minimum of the guideline range (minimum of guideline range > 0 months but ≤ 6 months).

      b.    <u>Length of Term of Probation</u>  (U.S.S.G. § 5B1.2)

    1.   At least 1 year but not more than 5 years (total offense level ≥ 6).

**[ ]**    2.   No more than 3 years (total offense level < 6).

      c.    <u>Conditions of Probation</u>  (U.S.S.G. § 5B1.3)

    The court must impose certain conditions of probation and may impose other conditions of probation.

**2.    SPLIT SENTENCE  (U.S.S.G. § 5C1.1(c)(2), (d)(2))**

**[X]**    a.   A split sentence is not authorized (minimum of guideline range = 0 months or > 10 months).

**[ ]**    b.   A split sentence is authorized (minimum of guideline range > 0 months but ≤ 10 months).  The court may impose a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention for imprisonment, provided that at least one-half of the minimum of the guideline range is satisfied by imprisonment (if the minimum of the guideline range is 8, 9, or 10 months), or that at least one month is satisfied by imprisonment (if the minimum of the guideline range is 1, 2, 3, 4, or 6 months).  The authorized length of the term of supervised release is set forth below in Item 4.b

**3.    IMPRISONMENT  (U.S.S.G. ch. 5, pt. C)**

A term of imprisonment is authorized by the guidelines if it is within the applicable guideline range (entered in Item 6 of Worksheet D).  (*See* U.S.S.G. § 5C1.1.)

(rev. 06/99)

4.    **SUPERVISED RELEASE**  (U.S.S.G. ch 5., pt. D)

    a.    Imposition of a Term of Supervised Release  (U.S.S.G. § 5D1.1)

        The court must impose a term of supervised release if it imposes a term of imprisonment of more than one year, or if it is required to do so by statute.  The court may impose a term of supervised release if it imposes a term of imprisonment of one year or less.

    b.    Length of Term of Supervised Release  (U.S.S.G. § 5D1.2)

| | | |
|---|---|---|
| ☐ | 1. | At least 3 years but not more than 5 years, where the count of conviction is a Class A or a Class B felony, i.e., an offense carrying a maximum term of imprisonment ≥ 25 years. |
| ☒ | 2. | At least 2 years but not more than 3 years, where the count of conviction is a Class C or a Class D felony, i.e., an offense carrying a maximum term of imprisonment ≥ 5 years but < 25 years. |
| ☐ | 3. | 1 year, where the count of conviction is a Class E felony or a Class A misdemeanor, i.e., an offense carrying a maximum term of imprisonment > 6 months but < 5 years. |
| ☐ | 4. | The statute of conviction requires a minimum term of supervised release of _____ months. |

    c.    Conditions of Supervised Release  (U.S.S.G. § 5D1.3)

        The court must impose certain conditions of supervised release and may impose other conditions of supervised release.

5.    **RESTITUTION**  (U.S.S.G. § 5E1.1)

| | | |
|---|---|---|
| ☐ | 1. | The court will determine whether restitution should be ordered and in what amount. |
| ☐ | 2. | Full restitution to the victim(s) of the offense(s) of conviction is *required* by statute.  (*See, e.g.,* 18 U.S.C. §§ 3663A, 2327.)  The parties agree that full restitution is $_____. |
| ☐ | 3. | The parties agree that the court may order restitution to the victim(s) of the offense(s) of conviction in any amount up to and including $_____.  (*See* 18 U.S.C. §§ 3663(a)(3).) |
| ☐ | 4. | The parties agree that the court may *also* order restitution to persons other than the victim(s) of the offense(s) of conviction.  (*See* 18 U.S.C. §§ 3663(a)(1)(A), 3663A(a)(3).) |
| ☒ | 5. | Restitution is not applicable. |

**6.    FINE** (U.S.S.G. § 5E1.2)

a. Fines for Individual Defendants

The court must impose a fine unless "the defendant establishes that he [or she] is unable to pay and is not likely to become able to pay any fine." (*See* U.S.S.G. § 5E1.2(a).)  Generally, the fine authorized by the guidelines is limited to the range established in the Fine Table. (*See* U.S.S.G. § 5E1.2(b).)  However, there are exceptions to this general rule. (*See* U.S.S.G. § 5E1.2(b), (c)(4).)

b. Fine Range from Fine Table (U.S.S.G. § 5E1.2(c)(3))

|  **Minimum Fine**  |  **Maximum Fine**  |
|---|---|
| $ 20,000 | $ 200,000 |

**7.    SPECIAL ASSESSMENT(S)** (U.S.S.G. § 5E1.3)

The court must impose a special assessment on every count of conviction.  The special assessments for individual defendants are

$100.00 for every count charging a felony ($50.00 if the offense was completed before April 24, 1996)
$ 25.00 for every count charging a Class A misdemeanor,
$ 10.00 for every count charging a Class B misdemeanor, and
$  5.00 for every count charging a Class C misdemeanor or an infraction.

The defendant must pay a special assessment or special assessments in the total amount of $ 100            .

**8.    ADDITIONAL APPLICABLE GUIDELINES, POLICY STATEMENTS, AND STATUTES**

List any additional applicable guideline, policy statement, or statute.

_____

**9.    UPWARD OR DOWNWARD DEPARTURE** (U.S.S.G. ch. 5, pts. H & K)

List any applicable aggravating or mitigating circumstance that might support a term of imprisonment above or below the applicable guideline range.

Defendant has cooperated by providing accurate and truthful information regarding criminal conduct of

himself and others, so the government will file a section 5K1.1 downward departure for substantial

assistance to authorities, resulting in a recommended reduction to 11 months in prison or less.

_____